## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GLOBAL NAPS, INC.,
    Plaintiff,

v.

VERIZON NEW ENGLAND INC.,
D/B/A VERIZON MASSACHUSETTS,
    Defendant.

CIVIL ACTION NO. _____

RECEIPT #_____
AMOUNT $_____
SUMMONS ISSUED_____
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY CLK_____
DATE_____

## COMPLAINT AND JURY CLAIM

### Parties

1.    The plaintiff, Global NAPs, Inc. ("Global"), a Delaware corporation with a principal place of business at 10 Merrymount Road, Quincy, MA, is a competitive local exchange carrier ("CLEC") under the provisions of the Telecommunications Act of 1996, 47 U.S.C. §251, *et seq.* (the "Act").

2.    The defendant, Verizon New England Inc. ("Verizon"), a New York corporation with a principal place of business at 185 Franklin Street, Boston, MA, is an incumbent local exchange carrier ("ILEC") under the provisions of the Act.

### Nature of the Action

3.    This is an action to collect the amounts due Global for transporting and terminating telephone calls by Verizon's customers to Global's Internet Service Provider ("ISP") customers pursuant to the Act and the rules and regulations of the Federal Communications Commission ("FCC").

## Jurisdiction

4.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §
    1331 (federal question). To the extent that any of the claims herein depend on
    state law, this Court has supplemental jurisdiction over those claims as well
    pursuant to 28 U.S.C. § 1367.

## Venue

5.  Venue is proper in this District under 28 U.S.C. § 1391. Venue is proper under §
    1391(b)(1) because Verizon has a principal place of business in this District.
    Venue is proper under § 1391(b)(2) because a substantial part of the events giving
    rise to this action occurred in this District.

## Introduction

6.  The Act permits CLECs to compete in the local telephone market with ILECs,
    some of which are the old Bell telephone companies.

7.  Under the provisions of the Act, ILECs must allow CLECs to interconnect their
    telephone networks to the ILEC's telephone network.

8.  Under the Act, in order to interconnect in this manner CLECs and ILECs must
    execute an interconnection agreement. For the most part, the interconnection
    agreements govern the procedures for, and details of, the interconnection, and are
    in turn must comply with the Act.

9.  CLECs and ILECs must transport and deliver calls from one another's networks
    to their customers. Thus, they have to cooperate to complete telephone calls.
    This includes telephone calls made to ISPs for dial up Internet access.

10.    Generally, when a customer of one carrier calls a customer of another carrier, the
       carrier of the party making the call must compensate the carrier of the party
       receiving the call for its work terminating the call.

11.    Global has brought this action to recover payment of intercarrier compensation
       for terminating telephone calls from Verizon's customers to Global's ISP
       customers after October 8, 2004.

**Facts**
**Compensation for Terminating Calls to ISPs**

12.    In 2001, in *Matter of Implementation of the Local Competition Provision in the
       Telecommunications Act of 1996: Intercarrier Compensation for ISP-Bound
       Traffic*, Order on Remand Report and Order, 16 F.C.C.R. 9151 (2001) ("*ISP
       Remand Order*"), the FCC preempted the regulation of intercarrier compensation
       for ISP-bound calls between carriers.  The FCC held that state commissions no
       longer have jurisdiction to consider the issue of intercarrier compensation for ISP-
       bound calls, and that the issue was no longer a fit subject for inclusion in new
       interconnection agreements.

13.    Specifically, in paragraph 82 of that decision, the FCC stated:

              The interim compensation regime we establish here applies as carriers
              renegotiate expired or expiring interconnection agreements.  It does not
              alter existing contractual obligations, except to the extent that parties are
              entitled to invoke contractual change-of-law provisions.  This Order does
              not preempt any state commission decision regarding compensation for
              ISP-bound traffic for the period prior to the effective date of the interim
              regime we adopt here.  Because we now exercise our authority under

section 201, to determine the appropriate intercarrier compensation for
ISP-bound traffic, however, state commissions will no longer have
authority to address this issue.

14. This ruling was prospective and did not apply to state commission's previous
decisions on previously arbitrated or negotiated interconnection agreements.

15. The compensation Verizon owes Global for termination of these calls is not
governed by an interconnection agreement in effect at the time of the *ISP Remand
Order*.

16. In the *ISP Remand Order*, the FCC adopted a series of caps limiting
compensation for terminating ISP-bound calls to a rate specified by the FCC, and
limiting the number of minutes that could be compensated to a percentage of the
minutes compensated in the first quarter of 2001. *Id.* at ¶ 98.

17. The FCC limits on the number of minutes that could be compensated were
referred to as growth caps and the new market rule.

18. As a consequence of these limits, new entrants in a state, or carriers that received
no compensation for terminating ISP-bound calls in the first quarter of 2001,
could not get paid for terminating ISP-bound calls under the federal caps. *Id.*

19. The FCC changed this compensation scheme effective October 8, 2004 in *Petition
of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) from
Application of the ISP Remand Order*, WC Docket No. 03-171 (Rel. Oct. 18,
2004) ("*CoreComm Order*"). A true and accurate copy of this Order is appended
as Exhibit "A."

20.     In the *CoreComm Order*, the FCC retained its rate caps, presently at
        $.0007/minute, but determined that growth caps and the new market rule were "no
        longer in the public interest," *Id.* ¶¶ 19-21. The FCC specifically concluded that
        "policies favoring a unified compensation regime outweigh any remaining
        concerns about the growth of dial-up Internet traffic." *Id.* ¶20.

21.     Under this ruling all carriers, whether they are new entrants or not, are to be paid
        the federal rate for terminating all ISP-bound traffic.

22.     This ruling is of particular importance to Global as almost all of the traffic it
        terminates for Verizon's customers is ISP-bound traffic.

23.     Global has terminated Verizon customers' traffic bound for the Internet since
        October 8, 2004, and is entitled to be compensated for this work pursuant to
        federal law.

### Monies Verizon owes Global for October, 2004

24.     On November 1, 2004, Global sent Verizon an invoice for $150,956.00 for
        terminating Verizon originated traffic in October, 2004 at the applicable federal
        rate, $.0007/minute.

25.     On November 23, 2004, Verizon sent a letter to Global disputing the charge and
        only agreed to pay $6,274.00.

26.     Verizon has not paid Global the $6,274.00.

27.     Verizon did not dispute Global's minute count, but stated that "[u]nder several
        applicable orders of the Massachusetts Department of Telecommunications and
        Energy (DTE") in docket 97-116 … ISP-bound traffic is not subject to reciprocal
        compensation in Massachusetts."

28.   Verizon's statement was incorrect because the FCC preempted the entire field of intercarrier compensation for termination ISP-bound traffic in the *ISP Remand Order*, so the federal rate applies to terminating all ISP-bound traffic after the effective date of the *CoreComm Order*, October 8, 2004.

29.   Upon information and belief, approximately $111,999.00, i.e. 23/31 of Global's charge $150,956 for October, 2004, was incurred on or after October 8, 2004.

30.   Under the *CoreComm Order*, Verizon owes Global $111,999 for October, 2004.

### Monies Verizon owes Global for November, 2004

31.   On December 1, 2004, Global sent Verizon an invoice for $196,612.00 for terminating Verizon originated traffic in November, 2004 at the applicable federal rate, $.0007/minute.

32.   On December 21, 2004, Verizon sent a letter to Global disputing the charge and only agreed to pay $7,450.00.

33.   Verizon has not paid Global the $7,450.00.

34.   Verizon disputed Global's minute count, resulting in a reduction of the bill by $14,876.  For purposes of this litigation, Global accepts Verizon's minute count.

35.   Verizon also stated that "[u]nder several applicable orders of the Massachusetts Department of Telecommunications and Energy ("DTE") in docket 97-116 ... ISP-bound traffic is not subject to reciprocal compensation in Massachusetts."

36.   As explained above, Verizon's objection regarding the DTE is incorrect.

37.   Under the *CoreComm Order*, Verizon owes Global at least $181,736.00 for November, 2004.

**Global's Demand**

38.    On December 22, 2004, Global sent a written demand to Verizon for payment.

39.    Verizon has failed to respond or make payment.

## COUNT I
### (October, 2004)

40.    The foregoing is reiterated and incorporated herein by reference.

41.    Under federal law Verizon owes Global $111,999.00 for terminating calls to ISPs in October, 2004.

## Count II
### (November, 2004)

42.    The foregoing is reiterated and incorporated herein by reference.

43.    Under federal law Verizon owes Global at least $181,736.00 for terminating calls to ISPs in November, 2004.

## Count III
### (Declaratory Relief. 28 U.S.C. §2201)

44.    The foregoing is reiterated and incorporated herein by reference.

45.    There is an actual controversy between Global and Verizon regarding Verizon's obligation since October 8, 2004 to pay Global for terminating calls to ISPs in Massachusetts. This controversy will continue as Global continues to terminate Verizon's customers' calls to Global's ISP customers.

46.    Global seeks a declaratory judgment or decree under 28 U.S.C. §2201 declaring the respective rights and obligations of the parties, and determining that since October 8, 2004, Verizon must pay Global $.0007/minute for terminating ISP bound telephone calls.

WHEREFORE, Global demands that the Court:

a.    Enter judgment in Global's favor against Verizon in the full amount of all monies,

      damages, interest, costs and attorneys' fees it owes Global;

b.    Declare that Verizon must pay Global for terminating calls to ISPs in

      Massachusetts since October 8, 2004, and determine the amount Verizon owes

      Global for terminating those calls; and

c.    Enter judgment for such other relief as is fair and just.

## JURY CLAIM

GLOBAL DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

                                        Global NAPs, Inc.
                                        By its attorneys:


                                        William F. Rooney, Jr. (BBO# 426920)
                                        Jeffrey C. Melick (BBO# 342130)
                                        Global NAPs, Inc.
                                        89 Access Road, Suite B
                                        Norwood, MA 02062
                                        Tel. (781) 551-9707
                                        Fax (781) 551-9984
                                        wrooney@gnaps.com

Dated:  January 11, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) *GLOBAL NAPS, INC.* V. *VERIZON NEW ENGLAND INC*

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

- [ ] I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [ ] II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.

*Also complete AO 120 or AO 121 for patent, trademark or copyright cases

- [X] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

- [ ] IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

- [ ] V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

*GLOBAL NAPS INC V. VERIZON NEW ENGLAND INC. #02-11501-MLW*

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
YES [ ] NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
YES [ ] NO [X]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
YES [ ] NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
YES [ ] NO [X]

7. Do **all** of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
YES [X] NO [ ]

    A. If yes, in which division do **all** of the non-governmental parties reside?
    Eastern Division [X]    Central Division [ ]    Western Division [ ]

    B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
    Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
YES [ ] NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME *JEFFREY C. MELICK*

ADDRESS *GLOBAL NAPS, INC. 89 ACCESS RD, SUITE B, NORWOOD MA 02062*

TELEPHONE NO. *781-551-0152*

(Coversheetlocal.wpd - 10/17/02)

%JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

GLOBAL NAPs, INC.

**DEFENDANTS**

VERIZON NEW ENGLAND INC.

**(b)** County of Residence of First Listed Plaintiff _NORFOLK_
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _SUFFOLK_
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) JEFFREY C. MELICK
GLOBAL NAPs, INC, 89 ACCESS ROAD, SUITE B
NORWOOD MA 02062 781-551-0152

Attorneys (If Known)

## II.  BASIS OF JURISDICTION  (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III.  CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☒ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V.  ORIGIN  (Place an "X" in One Box Only)

| | | | | | Appeal to District |
|---|---|---|---|---|---|
| ☒ 1  Original Proceeding | ☐ 2  Removed from State Court | ☐ 3  Remanded from Appellate Court | ☐ 4  Reinstated or Reopened | ☐ 5  Transferred from another district (specify) | ☐ 6  Multidistrict Litigation | ☐ 7  Judge from Magistrate Judgment |

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
47 USC 251 ; 28 USC 2201
Brief description of cause:
CLAIM FOR MONIES DUE FOR TERMINATING ISP-BOUND TELECOMMUNICATIONS

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ 243,735.00
AND CONTINUING

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII.  RELATED CASE(S)  IF ANY

(See instructions):

JUDGE   WOLF

DOCKET NUMBER   02-11501-MLW

DATE   1/11/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) ___ Dana Laing v. McCracken Financial Software, Inc.

FILED
IN CLERKS OFFICE

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

2005 JAN 18  A II: 34

U.S. DISTRICT COURT
DISTRICT OF MASS.

- [ ]  I.   160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [X]  II.  195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.  *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

- [ ]  III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

05  10107 MLW

- [ ]  IV.  220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

- [ ]  V.   150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]   NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ]   NO [X]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]   NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ]   NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [X]   NO [ ]

A.  If yes, in which division do all of the non-governmental parties reside?

Eastern Division [X]   Central Division [ ]   Western Division [ ]

B.  If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ]   Central Division [ ]   Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]   NO [X]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME ___ Lois Lewis

ADDRESS ___ 74 Fuller Terrace, West Newton, MA 02465

TELEPHONE NO. ___ (617) 969-4854

(CoversheetIocal.wpd - 10/17/02)

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| Petition of Core Communications, Inc. for | ) | |
| Forbearance Under 47 U.S.C. § 160(c) from | ) | WC Docket No. 03-171 |
| Application of the *ISP Remand Order* | ) | |

**ORDER**

**Adopted:** October 8, 2004                          **Released:** October 18, 2004

**By the Commission:** Commissioner Adelstein approving in part, dissenting in part, and issuing a statement.

## I.    INTRODUCTION

        1.    In this order, we address a petition filed by Core Communications, Inc. (Core)[1] requesting that the Commission forbear from enforcing the provisions of the *ISP Remand Order*.[2] For the reasons set forth below, we deny the petition with respect to rate caps and the mirroring rule, and grant forbearance with respect to the growth caps and new markets rule.[3]

## II.    BACKGROUND

###            a.    Intercarrier Compensation NPRM

        2.    On April 27, 2001, the Commission released a Notice of Proposed Rulemaking beginning a fundamental re-examination of all currently regulated forms of intercarrier compensation.[4] The

---

[1] *See Petition of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) from Application of the ISP Remand Order*, WC Docket No. 03-171, Petition of Core Communications, Inc. (filed July 14, 2003) (Core Forbearance Petition). On June 22, 2004, the Commission extended by 90 days, to October 11, 2004, the date by which the petition requesting forbearance shall be deemed granted in the absence of a Commission decision. *See Petition of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) from Application of the ISP Remand Order*, WC Docket No. 03-171, Order, DA 04-1764, at 2 (rel. June 23, 2004).

[2] *Intercarrier Compensation for ISP-Bound Traffic*, CC Docket No. 99-68, Order on Remand and Report and Order, 16 FCC Rcd 9151 (2001) *(ISP Remand Order)*, *remanded*, *WorldCom v. FCC*, 288 F.3d 429 (D.C. Cir. 2002), *cert. denied*, 538 U.S. 1012 (2003). Although the court rejected the legal authority upon which the Commission based its rules, the court did not vacate the *ISP Remand Order*. Accordingly, the interim rules adopted in the *ISP Remand Order* remain in effect.

[3] *See infra* paras. 6-9.

[4] *See In the Matter of Developing a Unified Intercarrier Compensation Regime*, CC Docket No. 01-92, 16 FCC Rcd 9610 (2001) *(Intercarrier Compensation NPRM)*.

Commission recognized the need to re-evaluate the existing intercarrier compensation regimes in light of increasing competition and new technologies, such as Internet and Internet-based services.[5] The Commission was particularly interested in identifying a unified approach to intercarrier compensation that would apply to all types of traffic and to interconnection arrangements between all types of carriers.[6] It identified a number of problems with the current intercarrier compensation regimes which potentially could be solved by adopting a bill-and-keep regime or some other unified approach to intercarrier compensation.[7]

3.       In response to the *Intercarrier Compensation NPRM*, the Commission received extensive comment from individual carriers and economists, industry groups and associations, consumer advocates, and state regulatory commissions, among others.[8] In addition, the Commission received numerous *ex parte* filings and detailed presentations from interested parties. In parallel with the Commission's consideration of these issues, industry-wide negotiations have taken place over the last year that have resulted in four separate proposals for comprehensive reform of the intercarrier compensation regime.[9] The Commission plans to move forward expeditiously in consideration of these new proposals.

### b.    ISP Remand Order

4.       Concurrent with the *Intercarrier Compensation NPRM*, the Commission released the *ISP Remand Order*. In that order, it concluded that traffic bound for Internet Service Providers (ISPs) is not subject to the reciprocal compensation requirements of section 251(b)(5).[10] The Commission concluded that ISP-bound traffic is "information access" and, therefore, is "carved out" of the scope of section 251(b)(5) by section 251(g), which preserves certain pre-Act equal access and interconnection arrangements, including compensation obligations.[11] It also affirmed its prior finding that ISP-bound

---

[5] *Intercarrier Compensation NPRM*, 16 FCC Rcd at 9611-12, para. 2.

[6] *Intercarrier Compensation NPRM*, 16 FCC Rcd at 9611-12, para. 2.

[7] *Id.* at 9612, para. 2.

[8] The Commission received more than 750 submissions, including more than 250 formal comments and reply comments.

[9] For example, the Intercarrier Compensation Forum, a coalition of nine local and long-distance phone companies including AT&T, MCI, Sprint, SBC, Level 3, Global Crossing, GCI, Iowa Telecom, and Valor, recently proposed a multiyear intercarrier compensation reform plan and universal service plan. *See* Letter from Gary Epstein, Counsel for the Intercarrier Compensation Forum, to Marlene Dortch, Secretary, FCC, CC Docket No. 01-92 (filed Aug. 16, 2004). *See also* Letter from Michael W. Young, Counsel for the Cost-Based Intercarrier Compensation Coalition, to Marlene Dortch, Secretary, FCC, CC Docket No. 01-92 (filed May 14, 2004) (proposing a single cost-based compensation rate based on the total element long-run incremental cost methodology); Letter from Ken Pfister, Great Plains Communications, to Marlene Dortch, Secretary, FCC, CC Docket Nos. 01-92 and 04-28 (filed June 9, 2004) (proposing a unified rate plan based on embedded costs); and Letter from Glenn H. Brown, Expanded Portland Group, to Marlene Dortch, Secretary, FCC, CC Docket No. 01-92 (filed May 12, 2004) (proposing a unified capacity-based compensation plan).

[10] *ISP Remand Order*, 16 FCC Rcd at 9171-72, para. 44.

[11] *ISP Remand Order*, 16 FCC Rcd at 9175, para. 52; *see also* 47 U.S.C. § 251(g).

traffic is jurisdictionally interstate and thus subject to the Commission's section 201 jurisdiction.[12]

5.　　In the *ISP Remand Order*, the Commission discussed at length the market distortions and regulatory arbitrage opportunities created by the application of per-minute reciprocal compensation rates to ISP-bound traffic.[13]　The Commission found that the availability of reciprocal compensation for this type of traffic undermined the operation of competitive markets because competitive LECs were able to recover a disproportionate share of their costs from other carriers, thereby distorting the price signals sent to their ISP customers.[14]　It concluded that a bill-and-keep regime might eliminate incentives for arbitrage and force carriers to look to their own customers for cost recovery.[15]　To avoid a flash cut to bill-and-keep, however, the Commission adopted an interim compensation regime pending completion of the *Intercarrier Compensation NPRM* proceeding.[16]

6.　　*Rate Caps.*　The interim regime adopted by the Commission consisted of a gradually declining cap on intercarrier compensation for ISP-bound traffic, beginning at \$.0015 per minute-of-use and declining to \$.0007 per minute-of-use.[17]　These rate caps reflected the downward trend in intercarrier compensation rates contained in recently negotiated interconnection agreements.[18]　The rate caps limited only what carriers could recover from other carriers; carriers remained free to recover any additional costs from their ISP customers.　Because the interim rates were *caps* on intercarrier compensation, the Commission determined that, to the extent the states had already set rates below the caps or imposed bill-and-keep for ISP-bound traffic (or otherwise had not required payment of compensation for this traffic), the lower rates would continue to apply.

7.　　*Growth Caps.*　In addition to reducing the intercarrier compensation rates, the Commission also imposed a cap on total ISP-bound minutes for which a LEC may receive this compensation equal to the total ISP-bound minutes for which the LEC was previously entitled to compensation, plus a 10 percent growth factor.[19]　These "growth caps" were based on projections of the growth of dial-up Internet access for the first two years of the transition and were considered necessary to ensure that such growth would not undermine the Commission's goal of addressing the market distortions attributable to the prevailing intercarrier compensation mechanism for ISP-bound traffic.[20]

8.　　*Mirroring Rule.*　The Commission also determined that the rate caps for ISP-bound traffic

---

[12] *ISP Remand Order*, 16 FCC Rcd at 9175, para. 52.

[13] *ISP Remand Order*, 16 FCC Rcd at 9181-86, paras. 67-76.

[14] *ISP Remand Order*, 16 FCC Rcd at 9183, para. 71.

[15] *ISP Remand Order*, 16 FCC Rcd at 9184-85, paras. 74-75.

[16] This interim regime altered only intercarrier compensation rates; it did not alter carriers' other obligations under the Commission's Part 51 rules or existing interconnection agreements. *ISP Remand Order*, 16 FCC Rcd at 9187, para. 78, n.149.

[17] *ISP Remand Order*, 16 FCC Rcd at 9187, para. 78.

[18] *ISP Remand Order*, 16 FCC Rcd at 9190-91, para. 85.

[19] *ISP Remand Order*, 16 FCC Rcd at 9191, para. 86.

[20] *ISP Remand Order*, 16 FCC Rcd at 9191, para. 86.

(or such lower rates as had been imposed by state commissions for the exchange of ISP-bound traffic) should apply only if an incumbent LEC offered to exchange all traffic subject to section 251(b)(5) at the same rates.[21]  If a LEC did not offer to exchange section 251(b)(5) traffic at the rates set forth in the *ISP Remand Order*, it was required to exchange ISP-bound traffic at the state-approved or state-arbitrated reciprocal compensation rates.  The Commission adopted this "mirroring" rule to ensure that incumbent LECs paid the same rates for ISP-bound traffic that they received for section 251(b)(5) traffic.

9.    *New Markets Rule.*  Finally, the Commission concluded that different interim intercarrier compensation rules should apply if two carriers were not exchanging traffic pursuant to an interconnection agreement prior to the adoption of the *ISP Remand Order*.[22]  In this situation, if an incumbent LEC has opted into the federal rate caps for ISP-bound traffic, the two carriers must exchange this traffic on a bill-and-keep basis during the interim period (the "new markets" rule).[23]  This rule applies, for example, when a new carrier enters a market or an existing carrier expands into a market it previously had not served.  The Commission implemented this rule in order to confine the opportunities for regulatory arbitrage to the maximum extent while seeking an appropriate long-term resolution for the problems associated with the existing intercarrier compensation regime.[24]

10.    On May 3, 2002, the United States Court of Appeals for the District of Columbia Circuit found that the Commission had not provided an adequate legal basis for the rules it adopted in the *ISP Remand Order*.[25]  Although the court rejected the legal rationale for the interim compensation rules, the court remanded, but did not vacate, the *ISP Remand Order* to the Commission, observing that there may be other legal bases for adopting the rules.[26]  Accordingly, the interim rules adopted in the *ISP Remand Order* remain in effect while the court remand is under review.

c.    **Core Forbearance Petition**

11.    Core filed a petition on July 14, 2003, requesting that the Commission forbear from enforcing the provisions of the *ISP Remand Order* with respect to the exchange of ISP-bound traffic between telecommunications carriers.[27]  More specifically, Core asks the Commission to forbear from applying the rate caps, growth caps, new markets rule, and mirroring rule of the *ISP Remand Order*.[28]

12.    Core contends that the rules promulgated under the *ISP Remand Order* are unsustainable for several reasons.  It claims that the D.C. Circuit remand decision calls into question the

---

[21] *ISP Remand Order*, 16 FCC Rcd at 9193-94, para. 89.

[22] *ISP Remand Order*, 16 FCC Rcd at 9188-89, para. 81.

[23] *ISP Remand Order*, 16 FCC Rcd at 9188-89, para. 81.

[24] *ISP Remand Order*, 16 FCC Rcd at 9188-89, para. 81.

[25] *WorldCom v. FCC*, 288 F.3d 429 (D.C. Cir. 2002).  Specifically, the court stated that section 251(g) of the Act does not provide a basis for the Commission's decision to create an exception to the reciprocal compensation requirements of the Act for calls made to ISPs located within the caller's local calling area.  *Id.* at 434.

[26] *WorldCom v. FCC*, 288 F.3d at 434.

[27] Core Forbearance Petition at 1.

[28] *Id.* at 6-7; Core Reply at 5.

legality of the rules promulgated under the *ISP Remand Order*.[29] Core also claims that the rules discriminate against new entrants.[30] Core further contends that the *ISP Remand Order* has discouraged investment by telecommunications companies.[31] Finally, Core argues that the Commission should forbear from applying the *ISP Remand Order*, because the rules are not necessary to prevent harm to consumers or to protect carriers from anticompetitive harm, and because forbearance is in the public interest.[32]

13.     A number of incumbent LECs oppose the petition.[33] In general, they argue that Core has not met the statutory criteria for forbearance, and they accuse Core of wanting to preserve a business plan dependent on regulatory arbitrage.[34] BellSouth states that Core offers no substantiated evidence to meet the statutory criteria for forbearance.[35] Qwest argues that consumers and the rest of the telecommunications industry should not be subject to harm simply because competitive LECs such as Core based their business plans on regulatory arbitrage.[36] SBC contends that Core's forbearance request would undermine the goals of a more rational cost recovery mechanism and reducing the market-distorting effects of reciprocal compensation for ISP-bound traffic.[37] Verizon argues that Core has no interest in being a "real local service provider," and that Core's assertions without any attempted proof are irrelevant to a forbearance analysis.[38]

14.     A variety of parties filed comments supporting the petition.  The West Virginia PSC Consumer Advocate Division argues that the statutory criteria for forbearance have been met, and it complains that the intercarrier compensation mechanism in place is based on an invalid assertion of jurisdiction.[39] MCI and TelNet also argue that the current rules have no basis in law, and that a bill and keep compensation regime is discriminatory and unfair with respect to ISP-bound traffic.[40] Xspedius contends that the Bell Operating Companies (BOCs) have not lived up to their obligations under the *ISP*

---

[29] Core Forbearance Petition at 3-4.

[30] Core Forbearance Petition at 4-6.

[31] Core Forbearance Petition at 6-9.

[32] Core Forbearance Petition at 9-11.

[33] A list of parties filing comments or oppositions in this docket is attached as Appendix A.

[34] *See* BellSouth Opposition at 3-4, 9-13; Qwest Opposition at 11-14; SBC Opposition at 3-5; Verizon Opposition at 2-4.

[35] Bellsouth Opposition at 4.

[36] Qwest Opposition at 12.

[37] SBC Opposition at 3.

[38] Verizon Opposition at 2-4.

[39] West Virginia PSC Consumer Advocate Division Comments at 3-20.

[40] MCI Comments at 2-3; TelNet Comments at 1-2.

*Remand Order.*[41]

## III.    DISCUSSION

15.    For the Commission to grant the forbearance requested by Core, we must determine that the three conditions set forth in section 10 of the Act are satisfied. In particular, section 10(a) provides that:

> The Commission shall forbear from applying any regulation or any provision of this Act to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that –

>> (1)    enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable, and are not unjustly or unreasonably discriminatory;

>> (2)    enforcement of such regulation or provision is not necessary for the protection of consumers; and

>> (3)    forbearance from applying such provision or regulation is consistent with the public interest.[42]

We note that Core's petition would be denied if any one of these prongs is not met. For the reasons explained below, we find that none of the three prongs is satisfied with respect to the rate caps and mirroring rule, but that all three prongs are met with respect to the growth caps and new markets rule.

### A.    Public Interest

16.    Core has provided only a cursory analysis of how each of the three criteria is satisfied. Core's primary argument is that the rules discriminate against competitive LECs in favor of BOCs. Core contends that the *ISP Remand Order* "has no basis in law and discriminates against and among competitive LECs in favor of the BOCs in a manner that is wholly inconsistent with the policy goals of the Act."[43] Core also asserts, without support, that these rules "have deterred investment in the telecommunications business, and have thereby substantially harmed the competitive telecommunications

---

[41] Xspedius Comments at 1-3. Xspedius contends that the BOCs have refused to pay the proper amount of money due for intercarrier compensation, forcing Xspedius to engage in protracted negotiations. *Id.*

[42] 47 U.S.C. § 160(a). With regard to the public interest determination required by section 10(a)(3), section 10(b) requires the Commission to "consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services." 47 U.S.C. § 160(b). Furthermore, "[i]f the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest." *Id.*

[43] Core Forbearance Petition at 2-3. According to Core, "the anticompetitive impact of the *ISP Remand Order* has dealt a crushing blow to CLECs, the telecommunications industry, and the broader national economy." *Id.* at 3.

industry and the broader national economy."[44]  Core complains that the mirroring rule is unfair, asserting that it allows BOCs to determine unilaterally the intercarrier compensation rates applicable to ISP-bound traffic.[45]  We find that all of these arguments are properly considered under the third prong of the forbearance analysis, which requires the Commission to consider whether forbearance is consistent with the public interest, and whether forbearance would "promote competitive market conditions."[46]  For the reasons described below, we find that Core's arguments do not satisfy the requirements of section 10(a)(3).  As explained below, we do find, on other grounds, that section 10(a)(3) has been met with respect to the growth caps and the new markets rules.

17.    As an initial matter, we reject Core's argument that the *WorldCom* decision somehow compels us to grant the requested forbearance.[47]  The court remanded but did not vacate the rules adopted in the *ISP Remand Order*.[48]  The court specifically stated that there was a "non-trivial likelihood" that the Commission would be able to justify the regime it adopted.[49]  Given this statement by the court, its decision to remand our order is not in itself a sufficient basis for forbearance.

18.    We also reject Core's broad, unsupported allegations that these rules "have brought about anticompetitive harm to CLECs, deterred investment in telecommunications businesses, limited the service options available to telecommunications consumers, and severely damaged the state of the telecommunications industry and the broader economy."[50]  Core provides no evidence to support these claims.  Nor does it challenge the continuing validity of the public interest rationale provided by the Commission when it adopted these rules.[51]  The Commission implemented the rate caps because the application by state commissions of per-minute reciprocal compensation rates to ISP-bound traffic "created opportunities for regulatory arbitrage and distorted the economic incentives related to

---

[44] Core Forbearance Petition at 6.

[45] Core Reply at 5. *See also* West Virginia PSC Consumer Advocate Division Comments at 6, 11-14.

[46] 47 U.S.C. §§ 160(a)(3), 160(b).

[47] *See* Core Forbearance Petition at 3-4. *See also* MCI Comments at 2; TelNet Comments at 2.

[48] *WorldCom, Inc. v. FCC*, 288 F.3d at 434.

[49] *WorldCom, Inc. v. FCC*, 288 F.3d at 434. We choose not to address the pending remand issues in this order. As explained above, and as we have explained to the D.C. Circuit in response to Core's pending mandamus petition, the Commission is considering comprehensive reform of intercarrier compensation mechanisms for all traffic, including ISP-bound traffic. *See In re Core Communications, Inc.*, Response of Federal Communications Commission to Petition for Writ of Mandamus, File No. 04-1179, United States Court of Appeals for the District of Columbia Circuit (Aug. 19, 2004) at 8-9. We have been presented with four separate proposals from different industry groups. *See* note 8 above. These proposals represent the product of unprecedented industry-wide negotiations regarding this extremely complex subject matter. We hope to move forward expeditiously in our consideration of these proposals. We find that the benefit of considering these important issues in a comprehensive manner outweighs the consequences, if any, of a delay in responding to the *WorldCom* remand. For similar reasons, we choose not to address pending petitions for reconsideration, clarification, or waiver of the *ISP Remand Order* at this time.

[50] Core Forbearance Petition at 11.

[51] *See* Core Forbearance Petition at 11; *see also ISP Remand Order*, 16 FCC Rcd at 9154-56, 9162, 9181-84, 9186-87, paras. 5, 7, 21, 67-71, 73, and 77.

competitive entry into the local exchange and exchange access markets."[52] These caps, which apply to all carriers, were designed to send more accurate price signals and substantially reduce market distortions.[53] Core does not challenge the Commission's conclusion that rate caps help avoid arbitrage and market distortions that otherwise would result from the availability of reciprocal compensation for ISP-bound traffic.

19.    Nor does Core address the Commission's concern that, without the mirroring rule, incumbent LECs would too easily be able to take advantage of the discrepancy between reduced rates for ISP-bound traffic and higher rates for section 251(b)(5) voice traffic. The mirroring rule was adopted to preclude incumbent LECs from paying reduced intercarrier compensation rates for ISP-bound traffic, which they send to competitive LECs, while collecting higher state reciprocal compensation rates for traffic that they receive. In addition, the mirroring rule promotes our goal of a more unified intercarrier compensation regime by requiring LECs to offer similar rates for like traffic. We find that the rate caps and mirroring rule remain necessary to prevent regulatory arbitrage and promote efficient investment in telecommunications services and facilities.

20.    *Growth Caps.*  We find that the growth caps are no longer in the public interest. Market developments since 2001 have eased the concerns about growth of dial-up ISP traffic that led the Commission to adopt these rules. The Commission imposed an overall cap on ISP-bound minutes for which compensation is due in order to ensure that growth in dial-up Internet access would not undermine the Commission's efforts to limit intercarrier compensation for this traffic, and to address intercarrier compensation in a comprehensive and unified manner.[54]  At the time of the *ISP Remand Order*, the Commission sought to prevent continued expansion of the arbitrage opportunity presented by ISP-bound traffic.[55]  Recent industry statistics indicate, however, that this expansion is not likely to occur given declining usage of dial-up ISP services. For example, one recent report suggests that the number of end users using conventional dial-up to connect to ISPs is declining as the number of end users using broadband services to access ISPs grows.[56]  We do not anticipate, therefore, that the availability of compensation to carriers that serve ISPs will have any material impact on the migration of consumers from dial-up services to broadband services. Thus, we now conclude that the policies favoring a unified compensation regime outweigh any remaining concerns about the growth of dial-up Internet traffic.[57]

21.    *New Markets Rule.*  We also find that the new markets rule is no longer in the public interest. This rule creates different rates for similar or identical functions. As explained above, although

---

[52] *ISP Remand Order*, 16 FCC Rcd at 9153, para. 2.

[53] *ISP Remand Order*, 16 FCC Rcd at 9186, para. 77.

[54] *ISP Remand Order* 16 FCC Rcd at 9101, para. 86.

[55] *ISP Remand Order*, 16 FCC Rcd 9188-89, para. 81.

[56] *See* Letter from Charles D. Breckinridge, Counsel for Level 3, to Marlene H. Dortch, Secretary, Federal Communications Commission, CC Docket Nos. 96-98, 99-68, 03-266, and 04-36, Attach at Ex. 1 (filed June 25, 2004 (attaching a report by Bernstein Research entitled "DSL Economics I: Continued Broadband Adoption to Drive 22 % DSL Revenue Growth Through 2008"); *see also Federal Communications Commission Releases Data on High-Speed Services For Internet Access*, News, at Table 1 (rel. June 8, 2004) (reporting only 2.7 million high-speed Internet access lines in December 1999 and 28 million high-speed Internet access lines in December 2003).

[57] *See infra* paras. 23-24.

the Commission implemented this rule in order to confine the opportunities for regulatory arbitrage, we find that these arbitrage concerns have decreased, and that these concerns are now outweighed by the public interest in creating a uniform compensation regime. Accordingly, we find that forbearance from this rule is consistent with the public interest.

### B.    Discrimination

22.    Section 10(a)(1) requires us to determine whether application of rate caps, growth caps, the mirroring rule, and the new markets rule are still "necessary to ensure that the charges, practices, classifications or regulations by, for, or in connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory."[58] Core argues that the rules are "discriminatory" and unfairly distinguish among CLECs.[59] More specifically, Core argues that "the reduced rates for reciprocal compensation, new market bar, and growth cap" require "only certain CLECs to recoup their terminating switch costs for ISP-bound traffic from their end users," thereby putting "those carriers at a competitive disadvantage as compared to the BOCs, and to other competitive carriers established within a specific local market prior to the Commission's implementation of the *ISP Remand Order.*"[60] We find that Core has not met the statutory test with respect to the rate caps or mirroring rule. We do find, however, that the growth caps and new markets rule are no longer necessary to ensure that charges and practices are just and reasonable.

23.    *Rate Caps and Mirroring Rule.*  Core has not demonstrated that enforcement of the rate caps or mirroring rule is no longer necessary to ensure that charges and practices are "just and reasonable," or to prevent rates that are "unjustly or unreasonably discriminatory." We find that the potential for discrimination under the rate caps is limited because the caps apply to ISP-bound traffic only if an incumbent LEC offers to exchange all section 251(b)(5) traffic at the same rate.[61] The mirroring rule was adopted based on our finding that the record lacked evidence of any material differences between the costs of delivering ISP-bound traffic and local voice traffic that would justify any difference in treatment between the two with respect to intercarrier compensation.[62] Because the record still lacks any such evidence, we affirm our prior conclusion that the mirroring rule is necessary to prevent disparate treatment of the two types of traffic. Accordingly, Core has not demonstrated that the rules result in impermissible discrimination against or between CLECs, or that the Commission's justifications for the interim rules are no longer valid.

24.    *Growth Caps and New Markets Rule.*  Both the growth caps and new markets rule require carriers to exchange ISP-bound traffic on a bill-and-keep basis under certain circumstances. Under the new markets rule, carriers must exchange ISP-bound traffic on a bill-and-keep basis if those carriers were not exchanging traffic pursuant to interconnection agreements prior to adoption of the *ISP Remand*

---

[58] 47 U.S.C. § 160(a)(1).

[59] Core Forbearance Petition at 2-3. Core contends that the *ISP Remand Order* "has no basis in law and discriminates against and among competitive LECs in favor of the BOCs in a manner that is wholly inconsistent with the policy goals of the Act." *Id.*

[60] Core Forbearance Petition at 9-10.

[61] *ISP Remand Order,* 16 FCC Rcd at 9193-94, para. 89.

[62] *ISP Remand Order,* 16 FCC Rcd at 9196, para. 93.

*Order*.[63] Under the growth caps, carriers may not receive compensation for ISP-bound minutes exceeding a particular growth factor.[64] Thus, the compensation rate for ISP-bound traffic in these circumstances is different than the rate that applies to ISP-bound traffic under the rate caps or to section 251(b)(5) traffic under the reciprocal compensation regime. These rules were adopted in order to prevent the expansion of the arbitrage opportunity associated with ISP-bound traffic. Given the market developments since that time,[65] however, we find that these rules are no longer necessary to ensure that charges and practices are just and reasonable, and not unjustly or unreasonably discriminatory. As the Commission observed in the *ISP Remand Order*, carriers likely incur the same costs when delivering a call to a local end user and a data call to an ISP.[66] In that order, the Commission declined to establish separate intercarrier compensation rates, terms, and conditions for local voice and ISP-bound traffic.[67] It concluded that the record failed to demonstrate different costs in delivering traffic that would justify disparate treatment of ISP-bound traffic and local voice traffic under section 251(b)(5). These conclusions suggest that similar rates should apply to both local voice traffic and ISP-bound traffic, absent compelling policy reasons to the contrary.[68] Accordingly, because we conclude that the policy rationale for those rules no longer outweighs policies favoring a unified compensation regime, we conclude that forbearance is warranted.

## C.    Protection of Consumers

25.    Section 10(a)(2) requires us to determine whether application of these rules is still "necessary for the protection of consumers."[69] Core makes no specific arguments to demonstrate that forbearance from the rules at issue would satisfy this standard. Instead, Core makes a general claim, without providing any support, that the rate cap, growth cap, and new markets rule have created "artificially high rates and reduced competitive choice," and have "forced CLECs from the market and deterred investment in telecommunications business, thereby limiting the service options available to telecommunications consumers."[70] Core's speculation regarding the connection between the *ISP Remand Order*, reduced investment in telecommunications facilities, and reduced choices for consumers does not satisfy the second prong of the statutory criteria for forbearance. Indeed, the rate caps and mirroring rule were implemented to prevent the subsidization of dial-up Internet access customers at the expense of consumers of basic telephone service, and to avoid arbitrage and discrimination between services. Core has provided no evidence regarding reduced investment or reduced competitive choices for consumers, nor has it provided any evidence demonstrating that the *ISP Remand Order* is the cause of any such

---

[63] *ISP Remand Order*, 16 FCC Rcd at 9188-89, para. 81.

[64] *ISP Remand Order*, 16 FCC Rcd at 9187, para. 78.

[65] *See supra* para. 20.

[66] *ISP Remand Order*, 16 FCC Rcd at 9194, para. 90.

[67] *ISP Remand Order*, 16 FCC Rcd at 9194, para. 90.

[68] *See ISP Remand Order*, 16 FCC Rcd at 9197, para. 93 (concluding that there was no reason to distinguish between voice and ISP-bound traffic with respect to intercarrier compensation).

[69] 47 U.S.C. § 160(a)(2).

[70] Core Forbearance Petition at 10-11. *See also* Core Reply at 8 (discussing the growth cap and new markets rule). Core makes a related argument that these rules "have deterred investment in the telecommunications business, and have thereby substantially harmed the competitive telecommunications industry and the broader national economy." Core Forbearance Petition at 6.

developments. Accordingly, we find that Core has not shown that rate caps or the mirroring rule are "not necessary for the protection of consumers."

26.    *Growth Caps and New Markets Rule.*  We do find, on other grounds, that application of the growth caps and new markets rule is not "necessary for the protection of consumers."[71]  These rules are directly related to intercarrier compensation, and were not implemented specifically for the protection of consumers.  As explained above, growth caps limit the total ISP-bound minutes for which a LEC may receive compensation.[72]  The new markets rule conditions the availability of compensation on whether two carriers were exchanging traffic pursuant to an interconnection agreement prior to the adoption of the *ISP Remand Order.*[73]  Accordingly, we find that neither the growth caps nor the new markets rule is necessary for the protection of consumers, and that forbearance is therefore warranted under this prong.

### D.    Applicability

27.    Our rationale for forbearance with respect to the growth caps and new markets rules applies with equal force to other telecommunications carriers.  Accordingly, on our own motion, we extend the grant of forbearance with respect to those rules to all telecommunications carriers.

### E.    Effective Date

28.    Consistent with section 10 of the Act and our rules, the Commission's forbearance decision shall be effective on Friday, October 8, 2004.[74]  The time for appeal shall run from the release date of this order.[75]

## IV.    ORDERING CLAUSES

29.    Accordingly, IT IS ORDERED that the petition for forbearance of Core Communications IS DENIED in part and GRANTED in part, as set forth herein.

30.    IT IS FURTHER ORDERED, pursuant to section 10 of the Communications Act of 1934, 47 U.S.C. 160, and section 1.103(a), that the Commission's forbearance decision SHALL BE EFFECTIVE on October 8, 2004.  Pursuant to sections 1.4 and 1.13 of the Commission's rules, 47 C.F.R. 1.4 and 1.13, the time for appeal shall run from the release date of this Order.

FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch

---

[71] 47 U.S.C. § 160(a)(2).

[72] *ISP Remand Order,* 16 FCC Rcd at 9191, para. 86.

[73] *ISP Remand Order,* 16 FCC Rcd at 9188-89, para. 81.

[74] *See* 47 U.S.C. § 160(c) (deeming the petition granted as of the forbearance deadline if the Commission does not deny the petition within the time period specified in the statute), and 47 C.F.R. § 1.103(a).

[75] *See* 47 C.F.R. §§ 1.4 and 1.13.

Secretary

**STATEMENT OF**
**COMMISSIONER JONATHAN S. ADELSTEIN**

*Re: Petition of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) from Application of the ISP Remand Order, WC Docket No. 03-171, Order*

I approve in part and dissent in part from this Order addressing our compensation rules for traffic destined to Internet Service Providers (ISPs). This Order largely retains our current rules for compensation for ISP-bound traffic based on a reasonable application of the statutory forbearance criteria. The Commission's existing rules were designed to limit opportunities for what the Commission had previously characterized as regulatory arbitrage.

I dissent in part from the Order, however, to the extent that it grants forbearance from two prongs of the Commission's rules concerning growth caps and new markets. While I appreciate competitive carriers' concern about the application of these rules to carriers late to serve the ISP market, the record before us does not persuasively suggest that the bases for the Commission's prior concerns about opportunities for regulatory arbitrage and disincentives to serve non-ISP end-user customers have dissipated. Though commenters argue that the number of dial-up subscribers has declined since the Commission last addressed this issue, the record before us suggests that dial-up minutes for ISP-bound traffic have held steady or are increasing in many areas of the country. More broadly, regulatory treatment of this traffic raises numerous complex issues for our policies regarding local competition, access to the Internet, and broadband deployment. These issues may be particularly pronounced for many rural areas, where broadband penetration rates may be lower than other areas of the country. Given the present record and these larger concerns, I would not have granted relief at this time.

## STATEMENT OF
## COMMISSIONER JONATHAN S. ADELSTEIN

*Re: Petition of Core Communications, Inc. for Forbearance Under 47 U.S.C. § 160(c) from Application of the ISP Remand Order, WC Docket No. 03-171, Order*

I approve in part and dissent in part from this Order addressing our compensation rules for traffic destined to Internet Service Providers (ISPs). This Order largely retains our current rules for compensation for ISP-bound traffic based on a reasonable application of the statutory forbearance criteria. The Commission's existing rules were designed to limit opportunities for what the Commission had previously characterized as regulatory arbitrage.

I dissent in part from the Order, however, to the extent that it grants forbearance from two prongs of the Commission's rules concerning growth caps and new markets. While I appreciate competitive carriers' concern about the application of these rules to carriers late to serve the ISP market, the record before us does not persuasively suggest that the bases for the Commission's prior concerns about opportunities for regulatory arbitrage and disincentives to serve non-ISP end-user customers have dissipated. Though commenters argue that the number of dial-up subscribers has declined since the Commission last addressed this issue, the record before us suggests that dial-up minutes for ISP-bound traffic have held steady or are increasing in many areas of the country. More broadly, regulatory treatment of this traffic raises numerous complex issues for our policies regarding local competition, access to the Internet, and broadband deployment. These issues may be particularly pronounced for many rural areas, where broadband penetration rates may be lower than other areas of the country. Given the present record and these larger concerns, I would not have granted relief at this time.